

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **JAMES WILLIAMS,** | ) |
| | ) |
| Plaintiff, | ) Case No. 06 C 6392 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Martin C. Ashman |
| **PEPSI-COLA GENERAL BOTTLERS,** | ) |
| **INC.,** | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This is a retaliatory discharge case. James V. Williams ("Williams") sued Pepsi-Cola

General Bottlers, Inc. ("Defendant"), in 2006, alleging that Defendant violated Title VII of the

1964 Civil Rights Act, 42 U.S.C. § 2000e-3(a), when it discriminated against him based on his

race, and when it retaliated against him by firing him for filing a race-discrimination charge with

the Equal Employment Opportunity Commission ("EEOC"). The district judge dismissed

Williams' race discrimination claim because he did not file it within the statutory period. Thus,

Williams' only remaining claim is for retaliatory discharge. Defendant filed a motion for

summary judgment as to the retaliation claim on March 20, 2008. The parties have consented to

have this Court conduct any and all proceedings in this case, including the entry of final

judgment. 28 U.S.C. § 636(c); N.D. Ill. L.R. 73.1. For the reasons stated below, the Court grants

Defendant's motion.

## I. Background

The facts the Court recites here are undisputed and are drawn from Williams' and

Defendant's statements of fact. This lawsuit concerns Williams' employment with Defendant.

Williams applied for employment with Defendant on or around October 12, 2005. (Pl.'s Resp. to

Def.'s Statement of Facts ("Pl.'s Resp. to SOF") ¶ 16; App. to Pl.'s Resp. to SOF ("App.") Ex. 47

at 41:13-42:22.) On this application, Williams indicated that he had left his previous employment

with the United States Postal Service ("USPS") because his mother was sick. (App. Ex. 47 at

43:9-14.) During his deposition, Williams claimed that he did not know why USPS terminated

him, though he later admitted it did so for absenteeism. (Pl.'s Resp. to SOF ¶ 17; App. Ex. 47 at

19:14-19, 28:7-12.)

In any case, Defendant hired Williams on December 1, 2005, to work at its facility

located at 1400 West 35th Street, Chicago, Illinois. (Pl.'s Resp. to SOF ¶¶ 1-2, 14; App. Ex. 23.)

Defendant hired Williams as a "warehouse general laborer," though Williams worked as a

"forklift operator." (Pl.'s Resp. to SOF ¶ 18.) Under the Collective Bargaining Agreement

("CBA"), there are two possible applicable definitions that apply to Williams, who was either a

"temporary" or "probationary" employee when hired:

> 15.5. Probationary Employees. New Employees and those
> hired after a break in continuity of service shall be regarded as
> probationary employees for the first sixty (60) calender days and
> shall receive no continuous service credit during such period.
> Probationary employees retained by the Employer subsequent to
> their first sixty (60) calendar days shall receive full continuous
> service credit from the date of last hire. Probationary employees
> may be laid off by the Employer and shall have no recourse under
> this Agreement.
> 15.6. Temporary Employee. [*sic*] Temporary employees
> (employees employed within the period commencing May 1

> through the Saturday following Labor Day) shall be considered
> probationary employees and shall receive no continuous service
> credit while so classified.
>     Temporary employees shall be given an opportunity to
> qualify as regular employees if available when needed if they meet
> all qualifications required of new applicants. Temporary employees
> reclassified as regular employees shall accrue seniority from the
> date they are classified as regular employees.

(App. Ex. 22.) On Defendant's "New Hire" form, which indicated employment with Defendant,

Defendant listed Williams as a temporary,[1] full-time employee with an "employee class"

designation of "union." (App. Ex. 23.) Williams' "payrule" listed his designation as "Chicago

Occasional." (*Id.*)

Williams testified that he was hired as a temporary employee, calling it an "occasional" or

"casual position." (App. Ex. 47 at 43:20-44:5.) Williams stated that when he applied, he sought a

full-time position, but did not receive one: he testified that "[Defendant] said from the time I

start, if I prove myself worthy in 90 days, I would be turned over to permanent because I made

that very clear before I signed." (App. Ex. 47 at 44:10-18.)

In addition to the CBA, Defendant maintained an Absenteeism Policy for Union Hourly

Employees ("Absenteeism Policy" or "the Policy"). (Pl.'s Resp. to SOF ¶¶ 24-25.) Williams

received a copy of the Absenteeism Policy on his first day of work. (*Id.*) The Policy "set limits

and establish[ed] guidelines for attendance." (App. Ex. 4 at 1.) Under the Absenteeism Policy,

"employees accrued points for tardi[ness], early departures[,] unexcused absences, and personal

days." (Pl.'s Resp. to SOF ¶ 26.) With certain exceptions, "each day of personal absence [was]

counted as one point[,] [and] [e]ach additional day of continuing absence [was] counted as an

---

[1] The job classification line on the form is preceded by the text, "Reg/Temp." (App. Ex. 23.)

additional [one-half] of one point." (App. Ex. 4 at 1.) The more points one accumulated, the more severe the resulting discipline: a verbal warning at the ninth point; a written warning at the tenth point; a one-day suspension and final warning at the eleventh point; and termination of employment at the twelfth point. (Pl.'s Resp. to SOF ¶ 27; App. Ex. 4 at 2.) As explained below, Defendant documented most of these warnings by issuing "Corrective Action Notices" ("CANs"). Furthermore, under the "No Call, No Show" provision, the Absenteeism Policy required employees to call before the start of their scheduled shift if they were "going to be tardy by more than 10 minutes." (Def.'s SOF ¶ 64.)

During Williams' employment with Defendant, Loading Supervisor Darrel Ledvina ("Ledvina") and Warehouse Manager Allan Mueller ("Mueller") supervised him. (Pl.'s Resp. to SOF ¶¶ 19-20.) Mueller's title was no accident: he managed all warehouse operations and decided which forklift operators would be promoted to full-time positions in the warehouse during Williams' employment with Defendant. (Pl.'s Resp. to SOF ¶¶ 19-22.) He also supervised Ledvina.[2] Mueller testified at his deposition that he enforced the attendance policy. He stated that his administrative assistant would write up individual CANs when an employee accrued a ninth point, a tenth point, and an eleventh point. (App. Ex. 5 at 30:21-31:21.) Mueller would then present the CAN to "his immediate supervisor to present to the employee." (App. Ex. 5 at 31:22-33:9.) On the eleventh point accrued, Mueller would "sign off on [the CAN], and then . . . present . . . [it] to the employee." (App. Ex. 5 at 33:10-14.) Mueller also stated that he would "terminate the employee" who reached twelve points. (App. Ex. 5 at 34:14-35:6.) Under the Policy, however, "[a]ll policy interpretations and terminations of employment must be approved

---

[2] Defendant admitted this fact at oral argument.

- 4 -

by Human Resources." (App. Ex. 4 at 2.) Mueller testified that, "in all terminations, [he] [had] to get approval" from "the human resource manager or location branch manager." (App. Ex. 5 at 34:13-35:13.)

Defendant tracked the attendance of all its employees, including Williams, with an electronic unit called Kronos, which recorded the times at which employees slid their identification badges through the machine. (Pl.'s Resp. to SOF ¶ 28; App. to Pl.'s Resp. to Def.'s Mot. Ex. 5 at 56:12-17.) Williams' attendance while working for Defendant was less than exemplary.

On July14, 2006, Mueller received, and gave to Ledvina to deliver, a CAN for Williams, reflecting violations of the Absenteeism Policy[3] that occurred in 2006 on the following days: January 5 and 13; February 13, 14, 15, and 23; March 6 and 9; April 18; June 5, 7, and 8; and July 12. (Def.'s SOF ¶ 31.) Ledvina gave this notice to Williams, at which point Williams asked, "Why does this always happen to me?" (Def.'s SOF ¶ 32.) Ledvina replied, "It's a white man's world." (Def.'s SOF ¶ 33.) Williams contends that Ledvina also said, "Now deal with it." (App. Ex. 25.)

Ledvina testified that he made this mark in jest. (Pl.'s Resp. to SOF ¶ 34.) Williams did not find the incident amusing and filed a Union Grievance. (Pl.'s Resp. to SOF ¶ 34; App. Ex. 27.) Subsequently, Mueller fired Ledvina, apparently because of this comment. (Def.'s SOF ¶ 35.) Williams also alleges that, upon asking for a promotion in the spring of 2006, Mueller

---

[3] This Opinion refers to these violations as "attendance occurrences" or "attendance violations."

"told me that he thought I acted like Malcolm X or Martin Luther King trying to rally the brothers." (App. Ex. 29 at ¶ 3; Pl.'s SOF ¶ 10.)

Several months later, on August 8, 2006, Williams filed a charge with the EEOC, alleging he was being wrongfully denied a promotion based on his race. (Pl.'s Statement of Facts ("Pl.'s SOF") ¶ 12; App. Ex. 12.) Plaintiff arrived late to work that day and was assessed one-half a point under the Absenteeism Policy. (Pl.'s SOF ¶ 12.)

Then, on or around August 14, 2006, Mueller received and presented to Williams another CAN, which reflected Williams' absences on the following dates in 2006: January 5 and 13; February 13, 14, 15, and 23; March 6 and 9; April 18; June 5, 7, and 8; July 12 and 26; and August 7 and 8. (Def.'s SOF ¶ 36.) This response indicated that Williams had accumulated twelve points under the Absenteeism Policy. (Def.'s SOF ¶ 37.) Mueller did not terminate Williams under the Policy at that time. (Def.'s SOF ¶¶ 37-38.) Around this time, Williams met with Mueller.[4] During the meeting, Williams asked Mueller to promote him to a full-time position. (Def.'s SOF ¶ 39; App. Ex. 5 at 59:9-17.) Mueller told Plaintiff that he was concerned about his attendance problems. (Def.'s SOF ¶ 40.) In discussing the promotion, Williams promised Mueller that his attendance would improve if Mueller promoted him. (Def.'s SOF ¶ 41.) Williams also informed Mueller that he believed some of the attendance points had been recorded inaccurately. (Def.'s SOF ¶ 42.)

Subsequently, Mueller removed the points Williams had received for eight separate attendance violations and voided the CAN that had been given to Williams on July 14, 2006.

---

[4] It appears from Williams' deposition that there was more than one meeting between Williams and Mueller. (Williams Dep. 56:1-60:6.)

(Def.'s SOF ¶¶ 44-45.) Mueller testified that he took these actions as a showing of good faith to Williams, and that he never removed points that any other employee had accrued. (Def.'s SOF ¶ 46.) Williams claimed that these points were removed because they were incorrectly assigned, and Mueller voided the CAN because it was based on these wrongfully assigned points. (Pl.'s Resp. SOF ¶¶ 44-45; App. Ex. 29 at ¶ 12; App. Ex. 47 at 69:10-24.)

Not much later, on August 18, 2006, Mueller promoted Williams to a full-time position as a forklift operator. (Def.'s SOF ¶ 48.) Mueller testified that he promoted Williams based on Williams' promise that his attendance would improve. (Def.'s SOF ¶ 53.) The form indicating this change reflected that Williams was now a regular, full-time employee, and his payrule classification was "Chicago Union Hrly 8 Hr 2d Sh." (App. Ex. 24.) Eight days after this promotion, on Saturday, August 26, 2006, Defendant assessed Williams with an attendance occurrence because he "called off" when he had been scheduled to work. (Def.'s SOF ¶ 54.)

Two days later, Monday, August 28, 2006, Mueller's administrative assistant prepared a CAN for Williams and gave it to Mueller. (Def.'s SOF ¶ 55.) This CAN listed attendance occurrences on the following dates in 2006: January 13; March 9; April 18; June 5, 7, and 8; July 12 and 26; and August 7, 8, and 26. (*Id.*) Four days after the CAN was issued, on September 1, 2006, Williams received another attendance occurrence because he left work early. (Def.'s SOF ¶ 56.)

About two weeks later, on September 12, 2006, Williams received another attendance occurrence because he had come late to work that day. (Def.'s SOF ¶ 57.) Williams worked 10.75 hours that day. (Pl.'s Resp. SOF ¶ 57; App. Ex. 33 at 6.) On or around the next day, September 13, 2006, Mueller's administrative assistant prepared and gave to Mueller another CAN for

Williams, which listed attendance occurrences on the following dates in 2006: January 13; March 9; April 18; June 5, 7, and 8; July 12 and 26; August 7, 8, and 26; and September 1 and 12. (Def.'s SOF ¶ 58.)

Williams continued to have attendance difficulties. He submitted a request to take off September 23, 2006, claiming it was his wife's birthday. (App. Ex. 47 at 85:15-20.) Williams, however, admitted that it was his girlfriend's birthday, not his wife's. (App. Ex. 47 at 85:21-86:9.) He also admitted he was not married, though he stated that many people thought he and his girlfriend were married because they shared the same last name and he called her "wifey." (App. Ex. 47 at 85:21-86:9.) Williams admits that he should have received, but did not, an attendance occurrence for this absence because it was a personal day, which counted as an attendance occurrence under the Policy. (Def.'s SOF ¶¶ 61-62.)

One week later, on September 30, 2006, Williams did not show up at 12:00 p.m., the start of his shift that day. (Def.'s SOF ¶ 63.) Although Williams did not call prior to the start of his shift, he claimed this resulted from a power outage, which prevented his alarm from waking him. (Pl.'s Resp. to SOF ¶¶ 65-66, App. Ex. 47 at 92:9-11, 93:5-12.) He also testified that he called work as soon as he woke up at 12:44 p.m and told one of Defendant's employees he would not be coming to work that day. (Resp. to SOF ¶¶ 65-66, App. Ex. 47 at 92:9-93:9; Def.'s SOF ¶ 67.) True to his word, Williams did not go to work on September 30, 2006. (Def.'s SOF ¶ 68.)

A few days later, around October 3, 2006, Mueller received two more CANs for Williams. (Def.'s SOF ¶ 69.) The first CAN reflected Williams' failure to call prior to missing work on September 30, 2006. (Def.'s SOF ¶ 70.) The second of these CANs reflected attendance occurrences on the following 2006 dates: January 13; March 9; April 18; June 5, 7, and 8;

- 8 -

July 12 and 26; August 7, 8, and 26; and September 1, 12, and 30. (Def.'s SOF ¶ 71; App. Ex. 13.) At this point, Williams had accumulated a total of eleven points under the Absenteeism Policy.[5] (App. Ex. 13.)

On October 16, 2006, Mueller terminated Williams' employment. (Def.'s SOF ¶ 75.) In response, Williams sued Defendant on November 22, 2006, alleging race discrimination and retaliation. As noted above, the district judge dismissed Williams' race discrimination claim.

Since this a retaliatory discharge case, Williams has submitted evidence showing the attendance of thirteen[6] other employees, each of whom Defendant asserts was a "regular, full-time employee." (Def.'s Resp. to Pl.'s Facts ¶¶ 3(a)-(f).) The Court reviews that evidence here.

Fonta Hendrix, a forklift driver, was issued a CAN on September 12, 2006, which stated that it was Mr. Hendrix's second warning in a twelve-month period, and that he had accumulated eighteen points. (App. Ex. 6.) Hendrix was absent or tardy on twenty different occasions, including one Saturday (July 22, 2006). (Id.)

Cesar Gutierrez, a forklift driver, was issued a CAN on May 25, 2006, which stated that it was Mr. Gutierrez's second warning in a twelve-month period, and that he had accumulated fifteen points. (App. Ex. 7.) He was absent or tardy on sixteen different occasions. (Id.)

---

[5] This point total excludes the points that Mueller previously removed.

[6] Williams also includes the termination form of an employee named Eric Jackson. (App. Ex. 48.) This form indicates that Defendant fired Jackson, whose employee class was "Union," for attendance problems. (Id.)

- 9 -

Raul Avalos, a forklift driver, was issued a CAN on September 23, 2004. (App. Ex. 32.) It stated that he had accumulated nine points and was his first violation. (*Id.*) He was absent or tardy on eleven occasions, including two Saturdays. (*Id.*)

Another CAN was issued for Avalos on August 29, 2006, which stated that it was Mr. Avalos' second or third warning in a twelve-month period, and that he had accumulated thirteen points. (App. Ex. 8.) He was absent or tardy on thirteen occasions, including five Saturdays. (*Id.*)

Donnell Pinckney, a forklift driver, was issued a CAN on June 30, 2004, which was signed by an unidentified party; Mueller's signature does not appear on the CAN. (App. Ex. 38.) It indicated that he had been absent or tardy eleven times and had accumulated nine points. (*Id.*)

Pinckney also was issued a CAN on September 28, 2004, which stated that it was Mr. Pinckney's second warning in a twelve-month period, and that he had accumulated twelve points. (App. Ex. 9.) Pinckney was absent or tardy on thirteen occasions, including five Saturdays. (*Id.*)

Gil Martinez, a forklift driver, was issued a CAN on June 4, 2006, which stated that it was Mr. Martinez's second warning in a twelve-month period, and that he had accumulated twelve points. (App. Ex. 10.) He was absent or tardy twelve times, including three Saturdays. (*Id.*) The CAN shows that Mueller was not Martinez's supervisor. (*Id.*)

Michael Taylor, whose job description was "Jeep," was issued a CAN on September 12, 2006, which stated that it was Mr. Taylor's fourth warning in a twelve-month period, and discharged her for excessive absences. (App. Ex. 11.) He was tardy or absent twenty-four times, including seven Saturdays. (*Id.*) Her supervisor was not Mueller. (*Id.*)

Williams also offered evidence showing that at least five other employees, four of whom were forklift drivers, had "as many or more points" as Williams but were not terminated: Monte Fort (eleven and one-half points) (App. Ex. 15),[7] Jose Vasquez (eleven and one-half points) (App. Ex. 17),[8] Darryl Wilson (eleven points) (App. Ex. 18),[9] Orlando Lozano (at least eleven points) (App. Ex. 20),[10] and Tyree Morris (at least eleven points) (App. Ex. 36).[11] The remaining two employees about whom Williams offers evidence did not have as many or more points as Williams: Tim Lloyd (at least nine points) (App. Ex. 16)[12] and Ted Petravich (at least nine points) (App. Ex. 19).[13] Defendant maintains that all of these employees were "regular, full-time employees." (Def.'s Resp. to Pl.'s SOF ¶¶ 5(a)-(g).) Mueller supervised all of these individuals except Fort, who had a different supervisor. (App. Ex. 15, 21.) Morris had a different supervisor when his first CAN was issued in 2004, but Mueller supervised him when he received a CAN in

---

[7] Monte Fort is listed as a "Jeep Driver 2." (App. Ex. 15.) Fort was issued two CANs, one on May 2, 2002, and another on August 2, 2006. (App. Ex. 15, 41). The former indicates that Mueller was not Fort's supervisor when issued. (App. Ex. 15.) It also indicates Fort was absent or tardy on eleven occasions, including one Saturday, and had accumulated eleven and one-half points. (App. Ex. 15.) The second CAN indicates Mueller was Fort's supervisor when it was issued. (App. Ex. 41.) It also indicates Fort was absent or tardy on thirteen occasions, including two Saturdays, and had accumulated nine points. (App. Ex. 41.)

[8] Vasquez was absent or tardy on thirteen occasions. (App. Ex. 17.)

[9] Wilson was absent or tardy on thirteen occasions, including one Saturday. (App. Ex. 18.)

[10] Lozano was absent or tardy on thirteen occasions. (App. Ex. 20.)

[11] Morris was absent or tardy on numerous occasions from 2004 - 2006, including seven Saturdays. (App. Ex. 21, 35, 36.)

[12] Lloyd was absent or tardy on fourteen occasions. (App. Ex. 16.)

[13] Petravich was absent or tardy on fifteen occasions, including three Saturdays. (App. Ex. 19.)

- 11 -

2005 (App. Ex. 21, 36); it is not clear who supervised Morris when he received a CAN, which is unsigned, in 2006 (App. Ex. 35).

## II. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court views all facts in the light most favorable to Williams and draws all justifiable inferences in his favor. *Anderson*, 477 U.S. at 255. Not all factual disputes will preclude summary judgment; rather, a genuine issue of material fact will exist only where there is evidence such that a jury "could reasonably find for the [nonmoving party]." *Id.* The parties may not rely on mere allegations or speculation in arguing for or against summary judgment. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008). At the summary judgment stage, both sides must support their factual assertions with "competent evidence of a type otherwise admissible at trial." *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

Although summary judgment may be inappropriate in cases where the plaintiff must prove motive or intent, those issues of proof do not preclude summary judgment. *Holland v. Jefferson Nat'l Life Ins., Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989). The primary issue is still whether, viewing the facts in the light most favorable to Williams and drawing all justifiable inferences in his favor, a jury could reasonably conclude that Defendant retaliated against Williams because he engaged in statutorily protected activity.

- 12 -

## III. Discussion

Williams argues that Defendant violated § 2000e-3(a) when it fired him after he filed a race discrimination claim with the EEOC. (Pl.'s Resp. to Def.'s Mot. Summ. J. ("Pl.'s Resp.") 6-15.) Defendant claims it terminated Williams for his constant tardiness and absences. (Def.'s Mem. in Support of Summ. J. ("Def.'s Mem.") 4-5.) Retaliatory discharge is covered by Title VII: § 2000e-3(a) prohibits employers from "discriminat[ing] against any . . . employee[] . . . because [the employee] has opposed any practice" Title VII forbids, or "because [the employee] has made a charge, testified, assisted, or participated in any manner in a[] [Title VII] investigation, proceeding, or hearing." Courts frequently refer to the activity in which employees are free to engage under the statute as "statutorily protected activity." *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008).

The law provides the plaintiff with two methods of proving retaliation under Title VI: the direct method of proof and the indirect method of proof. *Metzger*, 519 F.3d at 681. Defendant contends that Williams' claim fails under both the direct method of proof and indirect method of proof. (Def.'s Mem. 5-13.) Thus, this Court tests Williams' claim under each method.

### A. The Direct Method of Proof

Under the direct method, the plaintiff may, but need not, provide direct evidence of retaliation. *Metzger*, 519 F.3d at 681. Using direct or circumstantial evidence, the plaintiff must show "that (1) she engaged in statutorily protected activity; (2) she suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.*

- 13 -

Defendant does not contest that Williams engaged in statutorily protected activity or that he suffered an adverse action–nor should it. Filing a claim with the EEOC constitutes protected activity. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 787 (7th Cir. 2007) (stating that "filing . . . a[n] [EEOC] charge is a statutorily protected activity"); *Erinkitola v. Blue Cross Blue Shield Ass'n*, No. 07-1145, 2009 WL 383464, at *6 (N.D. Ill. Feb. 11, 2009) ("[The plaintiff] engaged in a statutorily protected activity-she filed an EEOC charge alleging discrimination . . . ."). Thus, an employer may not terminate an employee merely because they have filed a discrimination charge with the EEOC. *Szymanski v. County of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006) (deciding a summary judgment motion concerning a retaliatory discrimination claim, which the plaintiff claimed resulted from her filing charges with the EEOC).

Defendant's principal claim, then, is about the causal link between the filing of EEOC charge and Williams' discharge. Defendant argues that to prove causation, Williams must prove that Mueller had knowledge of the EEOC charge prior to terminating him. (Def.'s Mem. 6-7.) Defendant also argues that Williams cannot show causation by the sequence of events alone (Def.'s Mem. 7), and that Mueller terminated Williams pursuant to the Absenteeism Policy (Def.'s Mem. 8-9). Williams argues that, "[t]o establish a causal link, [he] only [*sic*] has to show that the protected activity and the adverse action were not wholly unrelated." (Pl.'s Mem. 6.) He also argues that Mueller knew that Williams filed an EEOC charge, and that the actions taken after this filing are evidence of discriminatory intent. (Pl.'s Mem. 7-10.)

To meet the burden for summary judgment on causation, the plaintiff must show that the decision-maker had knowledge of the employee's complaint. *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009). "[B]are assertions[] that the [defendant] received [the

employee's| charge of discrimination prior to" the adverse employment action, however, do not suffice. *Salas v. Wis. Dept. of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007). Also insufficient is a showing by the plaintiff that the notice was merely sent to the office of the decision-maker; the plaintiff must present evidence that the decision-maker actually received the notice. *Nagle*, 554 F.3d at 1122.

Nevertheless, circumstantial evidence of knowledge is still evidence; thus, the fact that the defendant's actions against the employee escalated after the complaint can suffice to show the decision-maker knew of the complaint and retaliated against the employee. *Byrd v. Ill. Dept. of Pub. Health*, 423 F.3d 696, 713-14 (7th Cir. 2005) (reviewing the increased action by the decision-maker against the plaintiff after the plaintiff filed a charge with the EEOC and stating that "the timing of these events and the dozens of communications between [the regional supervisor] and [the local supervisor] about [the employee's] performance during this time allow the jury to draw an inference that [the decision-maker] knew about the charge and was motivated by it").

This method of proof notwithstanding, "[p]*ost hoc ergo propter hoc* is not a good way to establish causation." *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005). That, of course, does not mean that a plaintiff *never* can show causation based on timing alone. But, to do so, the "temporal proximity" between the notice and the adverse action "must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). In the Seventh Circuit, causation may exist where the period of time between the employee's complaint and the adverse employment is "suspiciously short." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007)

("The causal link of retaliation claim is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action."). Usually, though, the employee will need to provide additional evidence "beyond suspicious timing." *Lewis*, 496 F.3d at 655; *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) (holding that the nearly three-month period that elapsed between the plaintiff's notice to the defendant that she intended to file a complaint with the EEOC and her firing was not sufficient, by itself, to establish causation); *see Boumehdi*, 489 F.3d at 793 (noting that the plaintiff provided "additional circumstantial evidence of" retaliatory intent); *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939-40 (7th Cir. 2007) (holding that the four- to six-month period between the complaint and the adverse action did not show causation); *Kodl v. Bd. of Edu. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007) ("[T]emporal proximity between [the plaintiff's] claimed protected activities and her transfer, standing alone, does not establish the requisite causal connection."). Racially motivated statements by the decision-maker can be evidence showing causation in a retaliation case, but the plaintiff must "demonstrate 'some nexus' between the remark and the challenged employment decision." *Scaife v. Cook County*, 446 F.3d 735, 741 (7th Cir. 2006).

Williams' evidence of causation is insufficient. As far as Mueller's knowledge is concerned, the only evidence Williams presented was his own declaration in which he claimed to have informed Mueller of the charge he filed with the EEOC during their meeting sometime after

August 8, 2006. That "bare assertion" is not sufficient to satisfy the standard set by the Seventh Circuit.[14]

Williams' contention regarding timing has more teeth, but the mouth of the argument still suffers from periodontitis. Williams essentially claims that Defendant's treatment of him after he filed the complaint shows that it knew about his EEOC filing. (Pl.'s Mem. 7.) First, he claims that his workload "doubled, probably tripled." (Def.'s Mem. 7 (citing Ex. 7, 138:5-17.) Except for his own testimony, Williams fails to cite any evidence to support this claim. Further tempering this claim is Williams' admission that he was paid more as a result of his extra work. (Williams' Dep. 140:7-17.)

Next, Williams claims that during the two months after he filed his EEOC charge, he received five written reprimands, although he had "received just one in the eight months before he filed" the charge. (Pl.'s Mem. 6.) This is true, as far as it goes; but the evidence shows that the CANs were issued because of poor attendance, not retaliatory intent. The first CAN Williams received after filing his EEOC charge came on August 18, 2006. But on August 8, 2008, Williams had shown up late to work.

The next CAN was issued to Williams on August 28, 2006. Prior to this, on August 18, 2006, Mueller met with Williams and *promoted* him. Also, Williams had called off work on August 26, 2006.

Williams was given another CAN on September 30, 2006. Again, the events occurring prior to this date are illustrative. On September 1, 2006, Williams left work early. He alleges he

---

[14] Even if Mueller had received the notice and, therefore, had actual knowledge of the EEOC charge, this Court's decision, as the remainder of this section shows, would not change.

did this because he was harassed but fails to provide more than conclusory assertions to that effect. Then, on September 12, 2006, Williams was late for work.

Williams' final CAN was issued on October 3, 2006, resulting in his termination. Again, the Court finds it helpful to look at the time period before the issuance of the CAN. Doing so reveals that on September 23, 2006, Williams took a personal day for which he should have been assessed an attendance point but was not. Then, on September 30, Williams failed to show, apparently because his power went out and he woke up late.

This evidence, taken as a whole, fails to show that Mueller retaliated against Williams for filing an EEOC charge. If anything, it shows that Mueller gave Williams preferred treatment on more than one occasion, promoting him and even failing to assess him an attendance occurrence on a day he should have received one. The fact that Mueller may have wanted to keep Williams apprised of his attendance situation, which needed improvement, does not show the prohibited animus. On the whole, the evidence, including the actions taken between the EEOC filing and Williams' discharge, do not show causation, regardless of whether Mueller actually received notice of the EEOC charge.

Before leaving this section, the Court addresses Williams' remaining arguments. Williams' argument that Mueller enforced the Absenteeism Policy more vigorously on Williams than others is not supported by the evidence. For example, Williams contends that "Defendant assigned Plaintiff a 'No Call[,] No Show' violation even though it had never enforced this part of the policy before." (Pl.'s Resp. 9.) To support this statement, Williams cites Defendant's responses to Williams' requests for documents and the CAN issued showing a "No Call, No Show" violation. But neither of these documents shows non-enforcement of this Policy.

- 18 -

Williams also claims that Defendant assigned Williams points for missing two Saturdays even though "the [A]bsenteeism [P]olicy generally was not enforced on Saturdays." (Pl.'s Resp. 9.) Again, however, the evidence cited does not support this claim. Several exhibits contain the attendance records of employees, including those of Fonta Hendrix and Raul Avalos. But without knowing what days Hendrix or Avalos were *assigned* to work, there is no evidence that Defendant failed to enforce the attendance policy against either of these individuals. Furthermore, Avalos' attendance records show that Defendant *did* enforce the Absenteeism Policy on Saturdays. Numerous Saturday entries on Avalos' attendance sheets are marked "Absent" (Ex. 31), and the CAN issued to him in September 2006 shows he missed work on five Saturdays. (Ex. 8.)

The evidence also shows Defendant enforced the Policy on other employees who missed work on Saturdays. Hendrix incurred an attendance occurrence on one Saturday. (App. Ex. 6) The CANs issued to Tyree Morris showed attendance occurrences incurred on seven different Saturdays. (App. Ex. 21, 35, 36.) The CANs issued to Monte Fort showed attendance occurrences on three Saturdays. (App. Ex. 15,[15] 41.) The Court need not recount any more numbers here--these are sufficient to show that Defendant *did* enforce its Absenteeism Policy on Saturdays, and did not impose it only on Williams

Williams' final argument--that Mueller's and Ledvina's racist remarks show discriminatory motive--misses the mark. Ledvina's racist remark--"[i]t's a white man's world, now deal with it"--does not show the *decision-maker's* discriminatory motive. (Pl.'s Resp. 9.) In fact, Mueller,

---

[15] On one of these CANs, the Court observes that Monte's supervisor was not Mueller. (Ex. 15.)

the decision-maker, actually fired Ledvina after this incident and then promoted Williams. If those facts are evidence of anything, they show that Mueller did *not* harbor racially discriminatory intent and, therefore, did not fire Williams because he filed a discrimination charge with the EEOC. Williams also alleges that, upon asking for a promotion, Mueller, "told me that he thought I acted like Malcolm X or Martin Luther King trying to rally the brothers." (App. Ex. 29 at ¶ 3.) Again, Williams relies upon his own conclusory testimony, which will not do. *Scafie*, 446 F.3d at 741. Moreover, context for this comment is unclear. Williams' statement from which this comment is drawn doesn't provide the factual details. Also, even if this comment is causally related to the retaliation claims, the inference of causation is too attenuated since Mueller promoted Williams *after* Williams filed his charge with the EEOC and subsequently revised Williams' attendance record in Williams' favor. As the axiom goes: actions speak louder than words. Here, Mueller's actions—firing Ledvina, promoting Williams, and removing attendance occurrences from Williams' record—speak much louder than Williams' bare assertion that Mueller made a racist remark.

In sum, the evidence Williams presented is insufficient to satisfy the direct method of proof.

## B. The Indirect Method of Proof

The indirect method of proof uses a different legal calculus than the direct method, employing a burden-shifting approach. *Metzger*, 519 F.3d at 681. The plaintiff must first establish a prima facie case "by showing that (1) she engaged in statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse action; and (4) she

was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse action. *Id.* If the employer meets this burden, "the burden of proof remains with the plaintiff," who must "show that the employer's proffered reason is pretextual." *Id.*

Neither party disputes that Williams satisfied the first and third elements of this test. Defendant, however, argues that Williams cannot show that he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity, and cannot show that he met Defendant's legitimate expectations.

### 1. Similarly Situated Employee

The "similarly situated" requirement is neither unduly rigid nor intractably flexible. *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 752 (7th Cir. 2007). "To determine whether two employees are directly comparable for a retaliation claim, [the Court] look[s] at 'all the relevant factors,[16] which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications-provided the employer considered these latter factors in making the personnel decision.'" *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 635 (7th Cir. 2009) (quoting *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003)). In essence, the court must ask "whether there are *sufficient commonalities on the key variables*

---

[16] As the Seventh Circuit noted in *South*, these factors must aim at "employment characteristics that are germane to [the] case" before the court. 495 F.3d at 753.

between the plaintiff and the would-be comparator" to allow a jury to compare them and find, based on all the relevant evidence, an inference of retaliation. *South*, 495 F.3d at 752 (emphasis in original). In other words, once similarly situated employees have been identified, the court must determine whether the employer treated these individuals, who did not engage in statutorily protected activity, more favorably than the plaintiff, who did. *Id.*

In this case, then, Williams must show that Defendant treated more favorably than him similarly situated employees who did not engage in statutorily protected activity. *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008). While not a per se rule, the Seventh Circuit has held that an employee who is subject to a different decision-maker than the plaintiff is not similarly situated. *Id.*; *see Patterson*, 281 F.3d at 680 ("[The compared employee] was not similarly situated to [the plaintiff] because they reported to different supervisors and had different levels of experience and job responsibilities."). Even so, however, the plaintiff cannot satisfy the similarly situated prong by merely "point[ing] to other employees with the same employment responsibilities and the same supervisor." *South*, 495 F.3d at 753. To show that other employees were similarly situated, "the employee must show that the other coworker had a 'comparable set of failings.'" *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006).

Williams points to other employees who had the same responsibilities and supervisor, arguing that each of these employees also had attendance problems and was not fired. The parties dispute whether these individuals, who were full-time employees, were similarly situated to Williams, who Defendant asserts was a temporary then probationary employee. (Def.'s Resp. to Pl.'s SOF 3.) Williams asserts he was hired as a probationary employee. (Pl.'s SOF 3.)

The evidence shows that both Mueller and Williams considered Williams a temporary employee, and Defendant treated him as one. This Court will not subvert substance to form–it adjudges the retaliation claim as the law commands, focusing on the decision-maker's state of mind. *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) (finding the formal classifications of employees irrelevant where the decision-maker evaluated and regarded the employees as different classifications). Here, the decision-maker and Defendant treated Williams as if he was a temporary employee. Indeed, Mueller met with Williams and considered promoting him, and eventually did so. That would not have been necessary if, as Williams contends, he was a probationary employee since, under the CBA, probationary employees were automatically promoted after sixty days. Additionally, Williams himself viewed his employment as temporary. He stated in his deposition that he was hired as a temporary employee and thought of himself that way. He accepted his position with the understanding that he would be given the chance to become a full-time employee after ninety days, not that he would automatically receive a promotion to a full-time employee after sixty days. For those reasons, Williams was a temporary then probationary employee; as such, Defendant could fire him at any time for any reason.

But beyond that hiccup, and assuming that Williams started as a full-time, probationary employee, Williams' case still faces a detrimental problem: Williams cannot show that the individuals to whom he compares himself are similarly situated. Williams failed to show that these individuals had repeated attendance problems, were given special dispensation, were promoted, and were fired after incurring attendance occurrence after dispensation had been granted. In fact, at least one of the individuals that Williams claims is similarly situated,

Mr. Taylor, was fired for accumulating absences. Others, including Fort and Morris, received suspensions for their attendance occurrences. Still other employees–Martinez (Ex. 10), Taylor (Ex. 11), Monte (Ex. 15)–had different supervisors when at least some of their attendance problems occurred and CANs were issued. Since none of the employees Williams identified had their attendance occurrences voided, were promoted, and then incurred further attendance occurrences, they are not similarly situated.

### 2. Employer's Legitimate Expectations

Defendant also claims that Williams did not meet its legitimate expectations. Williams claims that, "to meet Defendant's legitimate expectations under [the] [Absenteeism] [P]olicy, Plaintiff needed to limit his absences to an amount that would allow him to remain below the [twelve] point plateau." (Pl.'s Resp. 12.) "Therefore," according to Williams, "[he] met Defendant's legitimate expectations by not exceeding [twelve] points worth of absences." (*Id.*)

Defendant correctly points out that the court examines the plaintiff's "job performance through the eyes of her supervisors at the time of her . . . termination." *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 689 (7th Cir. 2008) (finding the plaintiff did not meet the employer's legitimate expectations where she admitted to consistently using the employer's telephone and Internet system for personal use, and where the record supported the employer's increasing displeasure with the plaintiff's performance). The plaintiff will fail on this element where negative evaluations of the employee both precede and follow the adverse action, and the plaintiff fails to proffer evidence "contesting the substance of [the employer's] criticisms." *Argyropoulos,* 539 F.3d at 735; *see Timmons v. Gen. Motors Corp.,* 469 F.3d 1122, 1128 (7th Cir. 2006) (holding, in

the context of an Americans with Disabilities Act discrimination claim, that the plaintiff failed to meet the employer's legitimate expectations where evidence showed that the plaintiff was not at work when required, failed to return phone calls, skipped required meetings, and admitted he was absent from work and skipped meetings).

The evidence shows, contrary to Williams' assertion, that he was not meeting Defendant's legitimate expectations at the time of his termination. Williams admits that he was late to work, or did not attend work, on several occasions. Williams also admits that, prior to his promotion, he accumulated over twelve attendance points, which Mueller reduced by voiding attendance occurrences. While Williams contends Mueller removed the attendance occurrences because they were erroneous, Mueller claims to have removed them based on Williams' promise to improve his attendance. In any case, Mueller could have fired Williams based on the accumulated points but decided against it. In fact, Mueller promoted him in spite of these failings based upon Williams' promise that his attendance would improve. Furthermore, Williams admits he had attendance problems after this promotion, including one incident where he claimed it was his "wife's" birthday even though he was referring to his girlfriend.

Williams' recurring tardiness and absences defeat his claim that he met the Defendant's legitimate employment expectations. The mere fact that Williams' point total at the time he was fired was below twelve does not mean that he met Defendant's expectations. Indeed, his past performance indicated he was not doing so; despite these failings, however, Mueller gave Williams another chance, but he failed to take advantage of it. After Mueller promoted Williams, Williams repeatedly violated the attendance policy by arriving late or failing to arrive at work, or leaving early. These violations included "calling off" work on August 26, 2006; leaving work

- 25 -

early on September 1, 2006; arriving late on September 12, 2006; taking off September 23, 2006; and failing to show for work on September 30, 2006. Those attendance occurrences, especially after a promotion and special dispensation, are telling. In finding that Williams did not meet Defendant's legitimate expectations, the Court notes that it "does not–and will not–sit as 'super-personnel' to question the wisdom or business judgment of employers." *Gates*, 513 F.3d at 689. Therefore, "this inquiry ends here, with [Williams'] inability to sustain [his] burden." *Id.*

## IV. Conclusion

Based on the foregoing, the Court finds that Williams has failed to put forth a sufficient amount of evidence to defeat Defendant's Motion for Summary Judgment. Since no genuine issues of material fact exist as to Williams' retaliation claim, the Court grants Defendant's Motion for Summary Judgment.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: July 6, 2009.                    United States Magistrate Judge

- 26 -